UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BANK OF UTAH, not in its individual capacity, but solely as Owner Trustee,<br><br>           Plaintiff,<br><br>    -against-<br><br>HI FLY LTD. (MALTA),<br><br>           Defendant. | Case No. 26-cv-5838<br><br><br>**COMPLAINT** |

Plaintiff Bank of Utah, not in its individual capacity but solely as Owner Trustee ("Bank of Utah" or "Plaintiff") for the benefit of Willis Lease Finance Corporation ("Willis" or "Beneficiary"), by and through the undersigned counsel, files this Complaint for breach of contract, conversion, and unjust enrichment against Defendant Hi Fly Ltd. (Malta) ("Hi Fly" or "Defendant") (together with Bank of Utah, the "Parties"), and alleges as follows:

**INTRODUCTION**

1. This action arises out of the failure by Hi Fly to make required rent payments on several aircraft engines leased to it by Plaintiff. Upon termination of the relevant lease agreements as a result of Defendant's continuing events of default, Defendant refused to timely return those engines in the required redelivery conditions in compliance with its obligations under the lease agreements. Instead, Defendant persisted in operating the aircraft engines in breach of the Parties' lease agreements.

2. Willis sent Defendant repeated notices, email correspondence, and demand letters regarding Defendant's event of default. Willis informed Defendant that its events of default were continuing and expressly demanded that Defendant remedy the defaults or return the engines.

Defendant failed to comply with those demands.  Instead, Defendant refused to prepare the engines for redelivery, continued operating the engines, and did not return the last of the engines in accordance with the contractual redelivery conditions, until May 2026, well after the repeated defaults and demands.

3.  As a result of Defendant's repeated and ongoing breaches, Plaintiff seeks damages, including without limitation, for rent arrears (totaling no less than approximately $1,228,829.94 USD to date), failure to maintain the engines, failure to timely return the engines, and failure to return the engines in compliance with the required redelivery conditions, plus fees and costs.

## JURISDICTION AND VENUE

4.  The United States District Court for the Southern District of New York has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy is between a citizen of a state and a citizen of a foreign country and exceeds the sum of $75,000.

5.  The United States District Court for the Southern District of New York has personal jurisdiction over Defendant because the parties consented to the jurisdiction of "the United States District Court located in the Borough of Manhattan, New York, NY" for "any suit, action or proceedings relating to this Agreement."  Ex. A Part I, Point 30; Ex. B Part I, Point 30; Ex. C Part I, Point 30; Ex. D § 16.8.1(i).

6.  Venue is proper in United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(3) because the Parties consented in the relevant agreements to jurisdiction and venue over "any suit, action or proceedings relating to this Agreement" in "the United States District Court located in the Borough of Manhattan, New York, NY."  Ex. A Part I, Point 30; Ex. B Part I, Point 30; Ex. C Part I, Point 30; Ex. D § 16.8.1(i).

## PARTIES

7.  Plaintiff Bank of Utah, Owner Trustee, is a company formed under the laws of Utah as a privately-owned state-chartered financial institution, with its registered office at 50 South 200 East, Suite 110, Salt Lake City, Utah 84111, USA.

8.  Defendant Hi Fly Ltd. (Malta) is, upon information and belief, a company duly incorporated and validly existing under the laws of Malta, with its registered office at SkyParks Business Centre, Level 5, Malta International Airport, Luqa, LQA 4000, Malta.

## NATURE OF ACTION

### The Lease Agreements

9.  On December 17, 2021, Hi Fly, as Lessee, and Plaintiff, as Lessor, not in its individual capacity but solely as Owner Trustee for the benefit of Willis, entered into a Lease Agreement for a CFM International CFM56-5C4 aircraft engine bearing manufacturer's serial number 567189 (the "567189 Engine") (as amended, novated, modified, and/or supplemented from time to time, the "567189 Agreement"), a true and correct copy of which is attached as **Exhibit A**.  The 567189 Agreement incorporates by reference and modifies the International Air Transport Association ("IATA") Document No. 5016-00 Master Short-Term Engine Lease Agreement, dated December 1, 2002 (the "Master Agreement"), which is an industry-standard form agreement developed by the International Air Transport Association (IATA) and the Aviation Working Group (AWG) that provides a standardized legal framework for short-term aircraft engine leases, with transaction-specific commercial terms incorporated through the relevant engine specific short-form lease agreement (*e.g.*, the 567189 Agreement) that is executed between the relevant lessor and lessee. A true and correct copy of the Master Agreement is attached as **Exhibit D**.

10. On January 21, 2022, Hi Fly, as Lessee, and Plaintiff, as Lessor, not in its individual capacity but solely as Owner Trustee for the benefit of Willis, entered into a Lease Agreement for a CFM International CFM56-5C4 aircraft engine bearing manufacturer's serial number 567187 (the "567187 Engine") (as amended, novated, modified, and/or supplemented from time to time, the "567187 Agreement"), a true and correct copy of which is attached as **Exhibit B**.  The 567187 Agreement incorporates and modifies the Master Agreement.

11. On May 18, 2022, Hi Fly, as Lessee, and Plaintiff, as Lessor, not in its individual capacity but solely as Owner Trustee for the benefit of Willis, entered into a Lease Agreement for a CFM International CFM56-5C4 aircraft engine bearing manufacturer's serial number 567193 (the "567193 Engine") (as amended, novated, modified, and/or supplemented from time to time, the "567193 Agreement"), a true and correct copy of which is attached as **Exhibit C**.  The 567193 Agreement incorporates and modifies the Master Agreement.

12. The lease agreements listed in the preceding paragraphs, including the incorporation and modification of the Master Agreement, will be referred to collectively herein as the "Agreements." The engines sold under the Agreements will be referred to collectively herein as the "Engines."

13. Under each of the Agreements, in return for lease of the Engines, Defendant was required to make payments of rent to Plaintiff.  *See* Ex. A Part I, Point 8, Schedule 1; Ex. B Part I, Point 8, Schedule 1; Ex. C Part I, Point 8, Schedule 1; Ex. D Annex 1.

14. The Agreements define "Rent" as an amount that "shall be hourly based on the rate of $125.00 per hour usage."  Ex. A Part I, Point 8, Schedule 1; Ex. B Part I, Point 8, Schedule 1; Ex. C Part I, Point 8, Schedule 1; Ex. D Annex 1.

15. The Agreements require that Defendant pay Rent on the "Rent Payment Date," and define such term as "[m]onthly in arrears with the first payment due one month after the Commencement

Date and subsequent payments due on the same day of the month each month thereafter during the Term." Ex. A Part I, Point 9; Ex. B Part I, Point 9; Ex. C Part I, Point 9; Ex. D Annex 1. The "Commencement Date" is defined as "the date that Lessee accepts the Engine." Ex. A Part I, Point 5; Ex. B Part I, Point 5; Ex. C Part I, Point 5; Ex. D Annex 1.

16. Further, under the Agreements, Defendant was responsible for certain maintenance and repairs to the Engines. Specifically, Section 4 of the Master Agreement required that Defendant:

> shall procure that routine scheduled, condition-monitored, and on-condition line maintenance is performed on the Engine Package, including preventative tests, and system checks. Such performance shall: (i) comply with (a) the Applicable Engine Standards, (b) the rules of the Aviation Authority, and (c) Lessee's maintenance program; and (ii) be undertaken at a standard which, in line with accepted industry practices, would be expected to keep the Engine (a) in a serviceable and airworthy condition, (b) fully operational, and (c) in as good operating and physical condition as at the time of delivery (save only normal wear and tear from ordinary operation).

Ex. D § 4.6.1.

17. Also under Section 4 of the Master Agreement (as modified by Exhibits A, B and C respectively), Defendant agreed that it:

> is responsible for the costs of repairing damage to the Engine, and replacing Parts and/or performing maintenance thereon (including any repair or replacement of, or maintenance performed on, any On Watch Items) to the extent caused during the Term directly by (i) the negligence of Lessee, (ii) the operational mishandling of the Engine, (iii) the operation of the Engine beyond limits, or (iv) a foreign object, unless the engine is Unserviceable.

Ex. A Part III; Ex. B Part III; Ex. C Part III; Ex. D § 4.6.2.

18. In addition, Defendant agreed, pursuant to Section 10 of the Master Agreement, to indemnify and hold Plaintiff and Willis harmless for claims and losses, regardless of the source or cause of such claims and losses, relating to:

(i) possession, use, operation, control, condition or status of the Engine Package; (ii) maintenance or performance of, or services, repairs or modifications to, the Engine Package; (iii) nonperformance of any obligation or any misrepresentation by Lessee under this Agreement, whether or not constituting an Event of Default; or (iv) transactions contemplated or permitted by this Agreement.

Ex. A Appendix E; Ex. B Appendix E; Ex. C Appendix E; Ex. D § 10.

19. Section 7 of the Master Agreement further states that "[r]isk of loss or damage to the Engine Package during the Term resides with Lessee," and requires that "Lessee shall be responsible for the cost of prompt restoration of the Engine to its condition prior to the Partial Loss." Ex. D § 7.1, 7.2.1(i).

20. Under Section 14 of the Master Agreement, "failure by Lessee to make any payment required under this Agreement within five days of the due date therefor" constitutes an Event of Default and repudiation of the Agreement by Defendant. Ex. D § 14.1(i). Section 14 also states that an Event of Default occurs when "an 'Event of Default' is continuing under any Lease Agreement entered into between Lessee and Lessor utilizing this Master Agreement." Ex. A Part III; Ex. B Part III; Ex. C Part III; Ex. D § 14.1(vi).

21. Upon the occurrence of an Event of Default, the "Lessor may, at its option: (i) accept that repudiation or deemed repudiation by giving notice to Lessee terminating this Agreement and/or the leasing of the Engine Package ('Lease Termination'); and/or (ii) take actions seeking performance of this Agreement by Lessee and/or recovery of Lessor's damages and costs caused by the Event of Default ('Enforcement Action')." Ex. D § 14.2.1.

22. In the event of a Lease Termination, "(i) Lessee's rights in respect of the Engine Package shall cease; and (ii) Lessee shall promptly pay Lessor the Termination Damage Amount." Ex. D § 14.2.2.

23. The Termination Damage Amount is defined to include "the sum of: (i) all amounts due and owing under the Agreement on the date of Termination, (ii) all costs and expenses incurred by Lessor to (a) bring the Engine Package into the condition required in 11.1-11.5, (b) cure all other Events of Default (which continue to adversely affect Lessor's rights or the value of that Engine Package), and (c) enforce its rights and remedies under the Agreement." Ex. A Part III; Ex. B Part III; Ex. C Part III; Ex. D Annex 1.

24. In the event of either a Lease Termination or an Enforcement Action, Lessee, among other things, "(i) agrees that Lessor may Take Possession of the Engine Package . . . ; (ii) agrees that Lessor shall be entitled to all expedited and/or interim remedies or judicial remedies . . . ; (iii) shall redeliver that Engine Package to the Redelivery Location." Ex. D § 14.2.3.

25. Section 11 of the Master Agreement specifies the required redelivery conditions for the Engines. It states that, "[w]ith reference to the Engine at the time of delivery to Lessee, the redelivered Engine shall: (i) be in as good operating and physical condition (save only normal wear and tear from ordinary operation); (ii) have the same external configuration; and (iii) contain a complete a set of Parts." Ex. D § 11.2.2.

26. Before redelivery, the Master Agreement requires that the "Lessee shall have performed on that Engine: (i) a hot and cold section video borescope in accordance with the relevant manufacturer maintenance manual, and (ii) any other performance tests set out in Part I, point 22 of the Lease Agreement. Lessee shall promptly provide Lessor with the results of all tests required by 11.3.1." Ex. D § 11.3.1, 11.3.2.

27. At the time of redelivery, the Master Agreement requires that:

> the Engine Documentation shall be in a form required for immediate use of the redelivered Engine under FAA or JAA rules and, without limiting the foregoing or 4.2 or 4.7.1(ii), shall include: (i) engine trend monitoring data gathered during its Term;

(ii) relevant defect or pilot reports during its Term; (iii) engine maintenance write-ups prepared during its Term; (iv) logs of Engine Flight Hours and Engine Flight Cycles during its Term; (v) copy of the engine preservation tag (original to be shipped with Engine); (vi) copy of the serviceability tag (original to be attached to Engine); (vii) a certificate stating that, during the Term, the Engine was not (a) involved in an accident, incident, fire or a major failure, (b) exposed to stress or heat beyond limits, (c) immersed in salt water or exposed to corrosive agents outside normal operation, or (d) operated by a Government Entity, or, if any of (a)-(d) occurred, describing such events in reasonable detail; and (viii) the additional documentation, if any, required by Part I, point 23 of the Lease Agreement.

Ex. D § 11.4.

28. When effecting redelivery, Section 11 of the Master Agreement requires that "Lessee shall prepare the Engine Package for shipment and transportation in accordance with (i) the generally applicable procedures and recommendations of the Engine manufacturer and (ii) the requirements specified in Part I, point 24 of the Lease Agreement." Ex. D § 11.5.

29. In turn, Part I point 24 of each engine-specific lease obligates the Lessee to adhere to the "[m]anufacturer's published recommendations, including completely sealing and covering the Engine, complying with proper equipment tie-down procedures and the use of air-ride suspension vehicles." Ex. A Part I Point 24; Ex. B Part I Point 24; Ex. C Part I Point 24.

30. Section 11 of the Master Agreement further states that, "if the redelivery does not occur in full compliance . . . , the Term is automatically extended until the date on which Lessee fully complies." Ex. D § 11.6.1.

31. Moreover, Section 11 requires that, "[d]uring any Term extension contemplated by 11.6.1, Lessee (i) may not use the Engine in flight operations, (ii) shall pay Rent plus amounts, if any, specified in Part I, point 25 of the Lease Agreement, and (iii) shall otherwise comply with its obligations hereunder." Ex. D § 11.6.2.

32. The additional amounts that Lessee is obligated to pay during a Term Extension include:

$30,000 per month, payable weekly in arrears, for each day following thirty (30) days after the expiration of the Term until the Engine Package is returned to Lessor in the condition required by Section 11 and pursuant to all other terms and conditions of the Lease Agreement provided that such amount will be payable only if the Lessee is not cooperating with the return process. In addition, failure by Lessee to return any Part to Lessor, or failure to return any Part in accordance with the requirements of the Lease Agreement, upon termination of the Lease Agreement shall result in Lessor purchasing such Part on behalf of Lessee at up to full list price and invoicing Lessee for such cost plus a handling fee equal to 15% of such cost, which fee is capped at $2,000.00 per Part. Lessee shall pay such invoice for such Additional Amounts within 30 days of receipt.

Ex. A Part I, Point 25, Schedule 1; Ex. B Part I, Point 25, Schedule 1; Ex. C Part I, Point 25, Schedule 1; Ex. D § 11.6.2.

**Defendant Defaults Under the Agreements**

33. Beginning in December 2024, Defendant failed to make Rent payments under the 567189 Agreement. *See* Ex. E Annex 2. In January 2025, Defendant also began failing to make Rent payments under the 567187 and 567193 Agreements. *See id.* Thus, by January 2025, Defendant had failed to make Rent payments under all of the Agreements.

34. Under the Agreements, failure to make required Rent payments "within five days of the due date therefor" constitutes an event of default. Ex. D § 14.1(i). The Agreements state that an event of default under any one of the Agreements between the Lessee and the Lessor constitutes a continuing event of default for all other Agreements between those parties. *See* Ex. A Part III; Ex. B Part III; Ex. C Part III; Ex. D § 14.1(vi).

35. On February 27, 2025, Willis sent a notice to Defendant that an event of default had occurred and was continuing under each of the Agreements (the "Event of Default"). The notice listed Rent payments that were due as of December 31, 2024; January 7, 2025; January 22, 2025; January 31, 2025; February 7, 2025; and February 24, 2025. Willis demanded that Defendant cure

the Event of Default and, if it failed to do so immediately, cease to utilize the Engines and prepare the Engines for return in their required redelivery conditions.  A true and correct copy of the February 27 Event of Default notice, including the invoices at issue, is attached as **Exhibit E**.

36. Willis sent Defendant an additional Event of Default notice on May 14, 2025.  This second notice listed Rent payments that were due as of February 28, 2025; March 7, 2025; March 24; 2025; March 31, 2025; April 7; 2025; April 24; 2025; April 30, 2025; and May 7, 2025.  Willis once again demanded that Defendant cure the Event of Default or, if it failed to do so immediately, cease to utilize the Engines and prepare the Engines for return in their required redelivery conditions.  A true and correct copy of the May 14 Event of Default notice, including the invoices at issue, is attached as **Exhibit F**.

37. The Event of Default notices described in the preceding paragraphs will be referred to collectively herein as the "Notices."

38. Following the Notices, Willis continued sending invoices to Defendant for payment obligations that Defendant continued to incur as a result of its failure to return the Engines in the required redelivery conditions in compliance with its obligations under the lease agreements.  The additional invoices are attached as **Exhibit G**.

39. In addition to the Notices and invoices, Willis sent several emails to Defendant regarding its Event of Default.

40. Despite communications exchanged between Willis and Defendant beginning in or around February 2025—including Notices, invoices, and email correspondence—regarding the Event of Default, Defendant remained in breach of the Agreements, having failed to make the required payments and otherwise comply with its obligations to return the Engines in the required redelivery conditions.

41. Defendant unlawfully operated the 567189 and 567193 Engines past the dates of the Notices and the contractually mandated time to cease utilization.  Defendant operated the 567189 Engine until April 9, 2025, two months after the first Notice.  Defendant operated the 567193 Engine until October 18, 2025, eight months after the first Notice.

42. Defendant also failed to prepare the Engines for redelivery in the required conditions and instead continued to unlawfully retain the Engines in their respective aircraft after the Notices and the contractually mandated time for redelivery.  Defendant did not remove the 567187 Engine from its aircraft to prepare it for redelivery in the required condition until September 10, 2025; the 567189 Engine until September 8, 2025; and the 567193 Engine until October 27, 2025.

43. Defendant improperly retained possession of the 567187 Engine until March 30, 2026; the 567189 Engine until December 19, 2025; and the 567193 Engine until March 27, 2026.  Defendant therefore unlawfully possessed the 567187 and 567189 Engines for thirteen months after the first Notice, and the 567189 Engine for ten months after the first Notice.

44. Defendant also failed to return the Engines in their required redelivery conditions.  All of the Engines were redelivered with parts either missing or requiring repair that Defendant failed to perform or complete, in violation of Section 11 of the Master Agreement.  *See* Ex. D § 11.2.2.

45. Defendant further breached Section 11 of the Master Agreement by failing to redeliver the 567187 and 567193 Engines with the required Engine Documentation.  *See* Ex. D § 11.4.

46. Willis sent Demand Letters to Defendant on December 23, 2025 and May 15, 2026.  True and correct copies of the Demand Letters are attached as **Exhibits H and I**.

47. The May 15, 2026 Demand Letter expressly stated that, if Defendant failed to pay the amounts owed by May 22, 2026, "Lessor will pursue all remedies available to it at law, in contract and in equity."  Ex. I.

48. Defendant has continued to fail to remedy its Event of Default and other breaches of its obligations under the Agreements.

### COUNT I – BREACH OF CONTRACT (FAILURE TO PAY RENT)

49. Plaintiff reincorporates paragraphs 1 through 46 above as if fully set forth herein.

50. Plaintiff, for the benefit of Willis, entered into the Agreements with Defendant, attached as **Exhibits A-D**.

51. Plaintiff and Willis fully and timely performed all of their material obligations under the Agreements.

52. Defendant breached the Agreements by failing to make the Rent payments required under the Agreements.  Defendant's breaches constitute events of default under the Agreements.

53. Under the Agreements, upon the occurrence of an event of default, "(i) Lessee's rights in respect of the Engine Package shall cease; and (ii) Lessee shall promptly pay Lessor the Termination Damage Amount."  Ex. D § 14.2.2.

54. The Termination Damage is "the sum of: (i) all amounts due and owing under the Agreement on the date of Termination, (ii) all costs and expenses incurred by Lessor to (a) bring the Engine Package into the condition required in 11.1-11.5, (b) cure all other Events of Default (which continue to adversely affect Lessor's rights or the value of that Engine Package), and (c) enforce its rights and remedies under the Agreement."  Ex. A Part III; Ex. B Part III; Ex. C Part III; Ex. D Annex 1.

55. Section 11 of the Master Agreement states that, following an Event of Default, Defendant is obligated to make payments of additional amounts equaling "$30,000 per month, payable weekly in arrears, for each day following thirty (30) days after the expiration of the Term until the

Engine Package is returned to Lessor in the condition required by Section 11." Ex. A Schedule 1; Ex. B Schedule 1; Ex. C Schedule 1; Ex. D § 11.6.2.

56. Despite notice and due demand, Defendant continued to breach all of the Agreements by failing to pay Rent, the Termination Damage Amount, and all other amounts due under the Agreements.

57. Accordingly, and as a result of Defendant's ongoing breaches, Plaintiff has suffered substantial damages in an amount to be determined at trial, but in no event less than $1,228,829.94 USD in Rent arrears to date, plus Termination Damage Amount, default interest, and costs incurred.

### COUNT II – BREACH OF CONTRACT (FAILURE TO MAINTAIN THE AIRCRAFT AND MEET REDELIVERY CONDITIONS)

58. Plaintiff reincorporates paragraphs 1 through 54 above as if fully set forth herein.

59. Plaintiff, for the benefit of Willis, entered into the Agreements with Defendant, attached as **Exhibits A-D**.

60. Plaintiff and Willis fully and timely performed all of their material obligations under the Agreements.

61. Defendant breached the Agreements by failing to return the Engines in their required redelivery conditions.

62. Defendant breached the Agreements by failing to return the 567187 Engine with a complete set of parts. Upon redelivery, the 567187 Engine was missing the following parts or the following parts required repair that was not performed or completed by the Lessee: IDG, Fire Detector Turbine, Hose Assembly, Tube, Engine Stand, Stand Shock Mount, Stand Swap.

63. Defendant further breached the Agreements by failing to return the 567187 Engine with the required Engine Documentation, including without limitation ownership documentation for its Engine Stand.

64. Defendant breached the Agreements by failing to return the 567189 Engine with a complete set of parts. Upon redelivery, the 567189 Engine was missing the following parts or the following parts required repair that was not performed or completed by the Lessee: AFT Mount, Fuel Inlet Hose, EGT Harness, Hose Assembly, Tube, Engine Stand Tow Bars, Engine Stand Steering Bar.

65. Defendant breached the Agreements by failing to return the 567193 Engine with a complete set of parts. Upon redelivery, the 567193 Engine was missing the following parts or the following parts required repair that was not performed or completed by the Lessee: AFT Mount, Anti-Ice valve, Coupling, Drain Mast, FWD Mount Attachment Hardware.

66. Defendant further breached the Agreements by failing to return 567193 Engine with the required Engine Documentation, including without limitation acceptance paperwork for its IDG QAD.

67. Under the Agreements, Defendant agreed that, upon redelivery, the Engines would "(i) be in as good operating and physical condition (save only normal wear and tear from ordinary operation); (ii) have the same external configuration; and (iii) contain a complete a set of Parts." Ex. D §11.2.2.

68. Additionally, the Agreements require that "Lessee shall be responsible for the cost of prompt restoration of the Engine to its condition prior to the Partial Loss." Ex. D § 7.1, 7.2.1(i).

69. The Agreements also required that, upon redelivery, "the Engine Documentation shall be in a form required for immediate use of the redelivered Engine under FAA or JAA rules." Ex. D §11.4.

70. Defendant breached the Agreements by failing to timely return the Engines in compliance with contractual redelivery conditions pursuant to Section 11 of the Master Agreement. *See* Ex. D §11.

71. Section 11 of the Master Agreement states that "failure by Lessee to return any Part to Lessor, or failure to return any Part in accordance with the requirements of the Lease Agreement, upon termination of the Lease Agreement shall result in Lessor purchasing such Part on behalf of Lessee at up to full list price and invoicing Lessee for such cost plus a handling fee equal to 15% of such cost, which fee is capped at $2,000.00 per Part." Ex. A Schedule 1; Ex. B Schedule 1; Ex. C Schedule 1; Ex. D § 11.6.2.

72. As a result of Defendant's failure to maintain the Engines and Engine Documentation, and failure to meet the required redelivery conditions, Plaintiff has suffered damages in an amount to be proven at trial but in no event less than $668,982.54 USD, plus interest and costs incurred.

## COUNT III – CONVERSION

73. Plaintiff reincorporates paragraphs 1 through 70 above as if fully set forth herein.

74. The actions of Defendant detailed above give rise to a cause of action for conversion of ownership interests regarding the Engines, as Defendant failed to timely return the Engines despite its contractual obligations and the Notices of Default.

75. Defendant continued to operate the Engines to generate income for itself, having appropriated the Engines to its own use and benefit.

76. Defendant continued to unlawfully possess the 567187 Engine until March 30, 2026; the 567189 Engine until December 19, 2025; and the 567193 Engine until March 27, 2026. Moreover, Defendant unlawfully operated the 567189 Engine until April 9, 2025 and the 567193 Engine until October 18, 2025.

77. Defendant had and has no lawful justification for doing so.

78. By its conduct alleged herein, Defendant has willfully and intentionally interfered with Plaintiff's right of possession of the Engines and Plaintiff has suffered damages as a result.

79. Plaintiff is entitled to damages in an amount to be determined at trial.

### COUNT IV – UNJUST ENRICHMENT

80. Plaintiff reincorporates paragraphs 1 through 77 above as if fully set forth herein.

81. Defendant has benefited from its actions alleged in this Complaint, including but not limited to, by failing to pay Rent and continuing to operate the Engines beyond the contractually mandated time to cease utilization and following the Notices of Default.

82. Defendant's benefit from those actions has been at Plaintiff's expense.

83. Equity and good conscience require restitution to Plaintiff of all benefits obtained by Defendant as a result of its improper actions.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

i.  Damages for all Rent arrears and additional amounts owed under Sections 11 and 14 of the Master Agreement, in an amount to be proven at trial, but in no event less than $1,228,829.94 USD;

ii.  Damages in an amount to be proven at trial, but in no event less than $668,982.54 USD, for Defendant's failure to maintain the Engines pursuant to Section 7 of the Agreements and failure to comply with the redelivery procedures under Section 11 of the Master Agreement;

iii.  Damages in an amount to be proven at trial as a result of Defendant's unlawful conversion of the Engines;

iv.    Damages in an amount to be proven at trial as a result of Defendant's unjust enrichment;

v.    Pre- and post-judgment interest in the maximum amount permitted by the Agreements and applicable law;

vi.    An award of attorneys' fees, costs and expenses, including enforcement costs; and

vii.    Such other relief as the Court deems just and equitable.

DATED: July 9, 2026    Respectfully submitted,


By    */s/   Judith A. Archer*
    Judith A. Archer
    Devlin Healey


Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Tel: (212) 318-3000
judith.archer@nortonrosefulbright.com
devlin.healey@nortonrosefulbright.com

*Attorneys for Plaintiff Bank of Utah*